UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SAFECO INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07 C 3024 |
| | ) | |
| L. CHRISTOPHER RENN, an Individual, | ) | Judge Joan B. Gottschall |
| and INTEGRATED CONSTRUCTION | ) | |
| GROUP, LTD., an Illinois Corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION & ORDER**

Plaintiff Safeco Insurance Company ("Safeco") filed suit against L. Christopher Renn and Integrated Construction Group, Ltd. ("Integrated"; collectively, "Defendants")[1] seeking reimbursement for Safeco's payment of various losses, fees, and expenses resulting from Safeco's issuance of various surety bonds. Safeco has now moved for summary judgment. For the reasons set forth below, Safeco's motion is granted.

### **I. BACKGROUND**[2]

Integrated Construction Technology Corporation ("ICTC") was formed as a minority-owned business in 1994, with Leslie Shy as President and owner of 51% of the company's shares, and Renn as Secretary and owner of 49% of the company's shares. The company was in the business of performing construction services in connection with various publicly owned construction projects. Although the precise nature of the

---

[1] Safeco initially named LBL Properties, LLC as an additional defendant, but the claims against that defendant were dismissed without prejudice upon Safeco's motion. (*See* Order, ECF No. 22.)

[2] Neither party complied with the local rules in their responses to their adversary's statement of fact. *See* L.R. 56.1(b). Unless otherwise noted, the facts set forth herein are either uncontested or have been deemed admitted due to the parties' disregard for the local rules. *See Greer v. Bd. of Educ. of City of Chi., Ill.*, 267 F.3d 723, 727 (7th Cir. 2001).

relationship between Integrated and ICTC is not addressed by either party in their summary judgment pleadings, it appears that Renn and Shy formed Integrated as a second business venture in the late 1990s or early 2000s; the division of company shares was identical to that of ICTC. (*See* Shy Dep. 8:19-10:2, ECF No. 117-5; Renn Dep. 12:9-13:3, ECF No. 117-6.)

In conjunction with performing construction services on publicly owned projects, ICTC was required to procure surety bonds to secure its work and payment of project vendors. In consideration of the issuance of these bonds on behalf of ICTC, Safeco required Defendants to enter into a General Agreement of Indemnity (the "Indemnity Agreement"). Renn (in both his individual capacity and as Secretary for Integrated) executed that Indemnity Agreement on November 10, 2003. The Indemnity Agreement contained, *inter alia*, the following provisions:

INDEMNITY TO SURETY: Undersigned agrees to pay to Surety upon demand:
> 1. All loss, costs and expenses of whatsoever kind and nature, including court costs, reasonable attorney fees (whether Surety at its sole option elects to employ its own attorney, or permits or requires Undersigned to make arrangements for Surety's legal representation), consultant fees, investigation costs and any other losses, costs or expenses incurred by Surety by reason of having executed any Bond, or incurred by it on account of any Default under this agreement by any of the Undersigned.

. . . .

With respect to claims against Surety:
> 1. Surety shall have the exclusive right for itself and the Undersigned to determine in good faith whether any claim or suit upon any Bond shall, on the basis of belief of liability, expediency or otherwise, be paid, compromised, defended or appealed.
> 2. Surety may incur such expenses, including reasonable attorneys' fees, as deemed necessary or advisable in the investigation, defense and payment of such claims.
> 3. Surety's determination in good faith of the foregoing shall be final and conclusive upon the Undersigned.
> 4. An itemized statement of loss and expense of the Surety, sworn to by an officer of the Surety, shall be prima facie evidence of the fact and extent of the liability of the Undersigned to Surety in any claim or suit by Surety against Undersigned.

. . . .
>Undersigned waive all notice of such default, of the payment of any claim or of the making of any loan to Contractor by Surety. Should Undersigned learn of any claim or suit against Contractor, for which Surety may be held liable, Undersigned shall give prompt notice to Surety of such claim or suit.

. . . .

GENERAL PROVISIONS:
>1. Assent by Surety to changes in any Contract or Bond or refusal to assent shall not release or affect the obligations of Undersigned to Surety even though any such assent by the Surety does or might increase the liability of the Undersigned.

. . . .

TERMINATION

. . . .

After the effective date of termination, the Undersigned giving notice shall be liable hereunder for:
>1. Bonds executed or authorized prior to such a date, and renewals and extensions thereof.

After the Indemnity Agreement was executed, Safeco issued a number of performance and payment bonds on behalf of ICTC. Allied North American Insurance Brokerage and its President, William Reidinger, acted as an agent for Safeco relating to the bonds issued to ICTC. These bonds include the bonds at issue here: Bond No. 6269820 (penal sum $3,775,219.00), Bond No. 6300068 (penal sum $4,991,961.00), Bond No. 6258485 (penal sum $15,654.00), Bond No. 6300013 (penal sum $1,927,314.01), and Bond No. 6258548 (penal sum $100,000.00).[3] All five of these bonds were issued while Renn was an owner of ICTC.

On March 29, 2005, Renn sold his interest in ICTC to Shy and relinquished his role as an officer. On April 26, 2005, Renn notified Safeco of the sale and requested termination of Renn's and Integrated's respective indemnity obligations for bonds issued by Safeco on behalf of ICTC (with the termination to be effective as of March 29, 2005).

---

[3] Safeco explained that certain of these surety bonds relate to "job order contracts," which are term jobs where the contractor provides a list of services that it will provide over the term at the request of the owner on the job. A surety bond for a job order contract is issued in a minimal penal sum amount to initiate the bonding of the job. The penal sum is then subsequently revised, via penalty riders, to conform to the work that is actually ordered by the project owner.

3

On January 3, 2006, Safeco agreed to do so. At that time, Safeco also notified Renn and Integrated that "in accordance with the provisions of the [Indemnity Agreement] this acknowledgment does not terminate you or [Integrated] as an indemnitor from liability for any Bonds executed, authorized, renewed or extended on behalf of [ICTC] on or before March 29, 2005." However, Safeco did not advise Renn that there were bond claims or lawsuits pending against ICTC until March 2007.

Safeco had received numerous claims from claimants stating that ICTC failed to make payments to them during the course of bonded construction projects. During the first quarter of 2006, Safeco received ICTC financials for the last six months of 2005; these financials showed a loss. In May 2006, Safeco learned that Wheaton Bank had pulled ICTC's line of credit; as a result, Safeco advised ICTC that it would not underwrite future bonds. ICTC was unable to find a new bond company. ICTC began diverting finds intended to pay subcontractors on bonded projects to pay down the amount owed to Wheaton Bank, to subsidize day-to-day operations, and to pay select subcontractors. In addition, at certain points in 2007 Wheaton Bank would sweep funds from ICTC's bank account and use those funds to pay down ICTC's line of credit with the bank. Safeco established a new joint bank account with ICTC at Key Bank in part to protect the remaining contract funds from these sweeps. Subsequent to receipt of the claims and the sweep of contract funds, Safeco also funded ICTC's payroll and commercial general liability insurance policies to ensure that ICTC would be able to complete bonded projects.

Safeco's practice when it received a claim was to have a Safeco claim representative write a letter to ICTC about the claim, acknowledge receipt of the claim to

the claimant, and set up a claim file. In its investigation of claims, Safeco engaged in frequent communications with ICTC representatives Shy and James Sideris (controller for ICTC) about the claims. Sideris also communicated with Allied North American Insurance Brokerage via William Reidinger, who acted both as ICTC's bonding agent and as attorney-in-fact for Safeco pursuant to an agency agreement. In addition, Sideris and Shy regularly communicated with Safeco's underwriter, Safeco's senior claims representative, and Safeco's claim representative. Shy undertook this communication in an effort to ensure that subcontractors of ICTC were paid and to mitigate damages, and indeed in some instances the amounts of bond claims were reduced.

Still, Safeco incurred various costs in connection with investigating and responding to the claims against the bonds. Safeco personnel submitted affidavits (organized by bond and payee) itemizing Safeco's payments, fees, and expenses; as of September 22, 2010, these amounted to a combined total of $1,581,440.07.

Following its receipt of claims, Safeco demanded that Defendants indemnify and hold Safeco harmless from all losses, fees, and expenses incurred in connection with Safeco's issuance of the bonds on behalf of ICTC. Defendants have not done so. Safeco alleges that Renn and Integrated breached their obligations under the Indemnity Agreement by failing to indemnify Safeco; Safeco calculates that it is owed that $1,581,440.07 plus interest. In response, Defendants have set forth three affirmative defenses: First, that Safeco violated its duty of good faith and fair dealing to Defendants; second, that Safeco failed to mitigate losses under the bonds; and third, that after March 29, 2005, Safeco raised the indemnity limit on some of the bonds without notice to or consent from Renn and Integrated, resulting in the discharge of Defendants.

## II. LEGAL STANDARD

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, all facts and any inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010). The court is not required to make every conceivable inference in the non-movant's favor; instead, only *reasonable* inferences must be drawn. *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009).

Further, "[t]he nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts"; a mere "scintilla of evidence in support of the nonmoving party's position will be insufficient to survive a summary judgment motion." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). Thus, once the moving party has satisfied its initial burden of "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact," *Creditor's Comm. of Jumer's Castle Lodge, Inc. v. Jumer*, 472 F.3d 943, 946 (7th Cir. 2007) (internal quotations and citations omitted), the non-moving party must come forward with sufficient evidence to "allow a jury to render a verdict in [its] favor." *McPhaul v. Bd. of Comm'rs*, 226 F.3d 558, 563 (7th Cir. 2000).

## III. ANALYSIS

As a preliminary matter, the court must address the parties' responses to the statements of facts. Curiously, both parties completely ignore the vast majority of the statements of fact—for instance, Defendants do not respond at all to paragraphs 1-29, 31,

33-39, 41, 44, 47, 49-50, 52, and 55 of Safeco's statement of facts; similarly, Safeco does not respond at all to paragraphs 1, 3-4, 8, 10, 12-13, 15, 17-18, 25, 27, 30-34, and 36-38 in Defendants' statement of additional facts. Safeco also objected to certain of Defendants' additional facts (paragraphs 7, 9, 11, 14, 16, 19-22) on the basis that the cited evidence was not of record, a situation which appears to have been remedied by the parties' stipulation to allow Defendants to file additional exhibits. (*See* Stip. to Supplement Defs.' Resp., ECF No. 130.) Because none of these facts are properly contested, they are deemed admitted. *See* L.R. 56.1.

But the curious behavior does not stop there; often the parties neither admit nor deny a specific fact, but simply rephrase seeking to add additional information in response. For example, Safeco states that when Safeco received a claim, a representative "would write a letter to ICTC about the claim, acknowledge receipt of the claim to the claimant, and set up a claim file." (*See* Pl.s' LR 56.1 Statement, ECF No. 117, ¶ 30.) In response, Defendants redraft the sentence, stating that the claim representative "would write a letter to ICTC directed to Les F. Shy, the owner of ICTC who was one of the indemnitors, and copies would be sent [to various entities]." (*See* Defs.' Resp. to Pl.'s LR 56.1 Statement, ECF No. 121, ¶ 30.) Safeco is no better, doing the same thing in its response. These improper attempts to bring additional facts before the court will not be entertained. *See Alvarado v. Corporate Cleaning Serv., Inc.*, 719 F. Supp. 2d 935, 938 n.1 (N.D. Ill. 2010) ("[I]t is improper for a party to smuggle new facts into its response to a party's L.R. 56.1 statement of fact."); *Bilal v. Dietz*, No. 03 C 9253, 2006 WL 83445, at *2 (N.D. Ill. Jan. 10, 2006); *Nair v. Principi*, No. 03 C 6806, 2005 WL 1950358, at *2 (N.D. Ill. Aug. 10, 2005) (noting that attempting to introduce new facts in

this way is not permitted); *Moreno v. St. Francis Hosp.*, No. 01 C 0064, 2001 WL 1263670, at *1 n.1 (N.D. Ill. Oct. 18, 2001) ("These explanations and restatements do not constitute proper denials."); *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) ("Simply providing additional facts in one's responsive memorandum is insufficient to put those facts before the Court."). For this reason, Safeco's paragraphs 30, 32, 40, 43, 45, and 48 are deemed admitted, as are Defendants' paragraphs 5, 6, 22, 23, 24, 26, and 29. Finally, Safeco's paragraphs 51, 53 and 54 are deemed admitted, because Defendants' denials do not fairly meet the substance of the alleged fact (and because Defendants again attempt to smuggle in new facts). *See Alvarado*, 719 F. Supp. 2d at 938 n.1 ("The requirements for a response under Local Rule 56.1 are 'not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted.'") (quoting *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000)).

Turning now to the merits, Safeco has alleged that Renn and Integrated breached their obligations under the Indemnity Agreement. In response, Defendants have argued that Safeco violated its duty of good faith and fair dealing, failed to mitigate losses under the bonds, and impermissibly raised the indemnity limit on some of the bonds without notice to or consent from Defendants. Because the express language of the Indemnity Agreement forecloses these defenses, Defendants cannot survive summary judgment.

**A. Good Faith And Fair Dealing**

Defendants' first argument is that Safeco had a duty to disclose material facts that increased the risk of loss to Renn and Integrated. In support, Defendants rely heavily upon the various Restatements in support of the duty of good faith; they also cite Vincent Reilly, Defendants' expert witness, who testified that the custom and practice in the

8

surety industry is to promptly acknowledge an indemnitors' request to be released on bonds and, if claims are pending at the time of the request, to advise the indemnitor of those claims. According to Defendants, Reilly's testimony supports their position that "notwithstanding the fact that the indemnity agreement may contain a provision stating that it is not necessary for the surety to give notice of a default," it is still the "general practice to send notice and/or demand letters to the principles and all indemnitors upon receipt by the surety of a bond claim." (*See* Defs.' Resp. to Pl.'s LR 56.1 Statement, ECF No. 121, ¶ 39.) Defendants further argue that Safeco acted arbitrarily and capriciously by giving notice of claims to certain indemnitors (such as Shy) while not giving notice to others (like Renn). Safeco responds with a variety of points, but the one that matters is Safeco's main argument: Renn and Integrated waived "all notice of such default, of the payment of any claim or of the making of any loan" by virtue of the express language of the Indemnity Agreement.

The parties apparently agree that Illinois law governs, and in Illinois the implied covenant of good faith and fair dealing is "a rule of construction, not a stand-alone obligation." *In re Kmart Corp.*, 434 F.3d 536, 542 (7th Cir. 2006) (citations omitted). While Illinois courts use the covenant to "determine the intent of the parties where a contract is susceptible to two conflicting constructions," Illinois law also holds that "parties to a contract are entitled to enforce the terms to the letter and an implied covenant of good faith cannot overrule or modify the express terms of a contract." *Cromeens, Holloman, Sibert, Inc v. AB Volvo*, 349 F.3d 376, 395-96 (7th Cir. 2003). So "[w]hen there is no ambiguity in a contract . . . the good-faith covenant does not come

9

into play." *Bank of Am., N.A. v. Shelbourne Devel. Grp., Inc.*, 732 F. Supp. 2d 809, 823 (N.D. Ill. 2010) (citing *Kmart*, 434 F.3d at 542)).

Here, there is no ambiguity. The Indemnity Agreement states that Safeco need not give notice of any default, the payment of any claim, or the making of any loan to a contractor. Defendants appear to argue that while they waived notice of default, they did not waive notice of claims, but this is a distinction without a difference. Reading the Indemnity Agreement as a whole, "default" is partially defined as a failure to pay claims, bills, or other indebtedness incurred in connection with the performance of any contract. In addition, the Indemnity Agreement provides that Defendants must give Safeco "prompt notice" where Defendants learn of any claims or suits in which Safeco could be liable, while no similar obligation is set forth for Safeco. The contract is not ambiguous.

As noted, Defendants argue that even where an indemnity agreement expressly states that the surety need not give notice of default, the general practice is to send letters to all indemnitors when a surety receives a claim. (*See* Defs.' Resp. to Pl.'s LR 56.1 Statement, ECF No. 121, ¶ 39.) Although the point is not explicitly made, the court construes this as an argument that while the Indemnity Agreement was clear on its face, it was ambiguous in light of industry custom. To that end, the court examined the whole of Mr. Reilly's testimony, as well as his expert report. Simply put, nothing in Mr. Reilly's testimony supports such a claim. While Mr. Reilly opined that notice should have been provided by Safeco, he never said that industry custom dictated that sureties would provide notice even where the express terms of a contract stated otherwise.

Renn also claims that when he received Safeco's January 3, 2006 letter, he understood that letter to mean that his liability was terminated on all bonds of ICTC. But

10

even if this is true, it is immaterial. First, this *post-facto* thought process can shed no light on the parties' agreement at the time the contract was signed. Second, even if it could, Renn's subjective understanding would be irrelevant. *See In re Resource Tech. Corp.*, 528 F.3d 467, 476-77 (7th Cir. 2008) (discussing a number of Illinois cases which hold that a party's unexpressed intent is not relevant). In sum, Safeco cannot breach the covenant of good faith and fair dealing by enforcing the contract to which the parties agreed. *See Cromeens*, 349 F.3d at 396. Because the contract is unambiguous, Defendants' good faith defense cannot succeed as a matter of law.

**B. Failure To Mitigate**

Defendants' second affirmative defense is that Safeco knew about ICTC's problems by at least June 2006, at which point Safeco had a duty to mitigate damages by reviewing ICTC's books and records; if Safeco had done so, Defendants argue that Safeco would have stopped the Wheaton Bank fund sweeps and started managing project payments earlier than March 2007, thereby lessening Defendants' exposure. Safeco argues that it only exercised those rights granted to it under the Indemnity Agreement. Safeco further claims that it did mitigate damages because it worked directly with ICTC owners and personnel to reduce bond exposure and compromise claims, funded ICTC's payroll and commercial general policies to keep ICTC in business, and set up separate bank account to protect ICTC funds.

Once again, the Indemnity Agreement has language addressing this situation. It provides that Safeco "shall have the exclusive right for itself and [Defendants] to determine in good faith whether any claim or suit upon any Bond shall, on the basis of belief of liability, expediency or otherwise, be paid, compromised, defended or

11

appealed"; further, Safeco's "determination in good faith of the foregoing shall be final and conclusive upon [Defendants]." Thus, as long as Safeco made its determination to pay the various bond claims in good faith, Safeco satisfied its duties under the Indemnity Agreement. *See Fidelity & Deposit Co. of Md. v. Marian Professional Const., Inc.*, No. 99 C 6787, 2004 WL 1718655, at *5 n.8 (N.D. Ill. July 29, 2004) ("While the arguments regarding [plaintiff's] duties to investigate and to mitigate damages *might* have some legal footing, the argument that [plaintiff's] acted in bad faith by allegedly paying on claims for which [defendant] was not liable is untenable. . . . Illinois courts have held that such language vests the surety with discretion to make payments and demand indemnity if it 'believed in good faith that it *might be* liable for the payments,' and such discretion is 'limited only by a showing of fraud or bad faith.' Taking it a step further, under such indemnity agreements, 'absent an affirmative showing of fraud or bad faith, the good faith of the plaintiff-surety [is] presumed.' . . . And of course, conduct expressly allowed by the contract cannot *itself* support that bad faith showing.") (citations omitted); *see also Safeco Ins. Co. of Am. v. M.E.S., Inc.*, 09 C 3312, 2010 WL 5437208, at *12-14 (E.D.N.Y. Dec. 17, 2010) ("Safeco, however, is obligated to settle defendants' claims against the Corps in good faith."); *Safeco Ins. Co. of Am. v. Oakland Excavating Co.*, No. 08 C 10546, 2009 WL 1658404, at *5 (E.D. Mich. June 12, 2009).

In this case, all of the actions alleged by Renn and Integrated fall within the purview of Safeco's decisionmaking as to how to best manage liability for claims against the bonds. As such, the terms of the Indemnity Agreement control, and Defendants were obliged to come forward with evidence of bad faith. *See Ner Tamid Congregation of N. Town v. Krivoruchko*, 638 F. Supp. 2d 913, 919 (N.D. Ill. 2009) ("Under Illinois law,

mitigation of damages is an affirmative defense on which the defendant bears the burden of proof.") (citations omitted); *see also Cates v. Morgan Portable Bldg. Corp.*, 780 F.2d 683, 688 (7th Cir. 1985).

Not only have Defendants not done so—the only bad faith alleged is a failure to give Defendants notice of ICTC's financial condition or pending claims, which as stated above does not constitute bad faith—but the facts as deemed admitted by this court establish that Safeco tried to mitigate damages. Safeco established that it actively worked with ICTC owners and personnel, as well as the company's bonding agent, when it received claims. In some cases, this resulted in the amount of a bond claim being reduced. Safeco also funded ICTC's payroll and commercial general liability insurance policies to ensure that ICTC would be able to complete bonded projects, and set up a separate bank account to protect funds from Wheaton Bank's sweeps. Defendants have provided no evidence to support their claim that these acts were insufficient, nor have they established what specific damages could have been mitigated with competent evidence. Thus, whether the court views the question as turning on the express language of the Indemnity Agreement or on Defendants' inability to carry their burden of proof, the answer remains the same: this affirmative defense cannot survive summary judgment.

**C. Modifying Bond Limits**

While Defendants put forth an affirmative defense that Safeco's unilateral modification of the bond liability discharged their obligations, they have not addressed this issue in their response to Safeco's motion for summary judgment. Even if they had done so, this defense cannot succeed for the same reason that the good faith defense cannot succeed: the express terms of the Indemnity Agreement foreclose the argument.

13

While it is true that "usually the obligations of a third-party guarantor are discharged when parties to a contract unilaterally effect a material change in their own relationship that also affects the potential liability of the guarantor, a guarantor is free to give prior consent to such modifications." *Cincinnati Ins. Co. v. Leighton*, 403 F.3d 879, 886 (7th Cir. 2005). Indeed, "[p]arties to such a guaranty contract are entitled to enforce its terms to the letter—including holding a party to its waiver of the consent to material alterations that may increase liability." *Id.* at 886-87 (citing *Bank One, Springfield v. Roscetti*, 723 N.E.2d 755, 764 (Ill. App. Ct. 1999)); *see also id.* at 887 n.1 ("Illinois courts have clearly and repeatedly held that a guarantor is free to waive notice or consent to material changes in a guaranty agreement, and that such waivers must be construed according to their plain terms.").

In this case, the Indemnity Agreement expressly provided that Safeco could assent or refuse to assent "to changes in any Contract or Bond" and that this decision "shall not release or affect the obligations of [Defendants] to [Safeco] even though any such assent by [Safeco] does or might increase the liability of [Defendants]." What's more, the contract provided that "after the effective date of termination, [Defendants] giving notice shall be liable hereunder for . . . Bonds executed or authorized prior to such a date, *and renewals and extensions thereof.*" In executing the Indemnity Agreement, then, Defendants waived their right to notice or consent to any changes in the bonds. *See Cincinnati Ins. Co.*, 403 F.3d at 886-87.

**D. Amount In Controversy**

Having established that Defendants were required to indemnify Safeco for any "losses, costs or expenses" Safeco incurred under the bonds at issue and Defendants

14

failed to do so, the court must now address damages. Under the Indemnity Agreement, the parties previously agreed that "[a]n itemized statement of loss and expense of the Surety, sworn to by an officer of the Surety, shall be prima facie evidence of the fact and extent of the liability of the Undersigned to Surety in any claim or suit by Surety against Undersigned." Safeco submitted itemized statements of loss and expense, which were sworn to by Mr. David Pikulin, Assistant Vice President of Safeco, and Ms. Stacy Goetz, Home Office Counsel for Safeco. (*See* Aff. of Pikulin, ECF No. 117-2, ¶¶ 10-16 & Ex. C; Aff. of Goetz, ECF No. 117-14, ¶¶ 6-9 & Ex. A.) These affidavits claim a total amount owed of $1,581,440.07.

Renn and Integrated state that these affidavits are insufficient, because the affidavits are contradicted by the deposition testimony of Sideris and Goetz. Defendants claim that Safeco had all funds from all projects (including those secured by bonds not covered by Defendants' Indemnity Agreement) deposited into a single "master account"; Safeco would then arbitrarily attribute the payments it made to various ICTC bond claims. Defendants also argue that the summaries provided are flawed because the summaries do not indicate whether a certain expense stemmed from one of Defendants' bonded projects or projects where Defendants had no liability.

Unfortunately for Defendants, none of these factual allegations are set forth in their statement of additional undisputed material facts. The only time Defendants addressed these issues was as part of an attempt to add new facts in their response to Safeco's statement of facts. (*See* Defs.' Resp. to Pl.'s LR 56.1(a)(3) Statement, ECF No. 121, ¶¶ 51, 53-54.) As already explained, "the Court will not consider any additional facts proposed in the nonmoving party's Local Rule 56.1(b)(3)(B) Response, but instead

must rely on the nonmovant's Local Rule 56.1(b)(3)(C) Statement of Additional Facts when making factual determinations." *BP Amoco Chem. Co. v. Flint Hills Res., LLC*, 615 F. Supp. 2d 765, 768 (N.D. Ill. 2009).

While Defendants could attempt to rebut Safeco's *prima facie* liability evidence by coming forward with their own "counteraffidavits, or other evidence," *see United Fire & Cas. Co. v. Bartlett Bituminous Asphalt, LLC*, No. 06 C 0996, 2008 WL 373219, at *7 (N.D. Ill. Feb. 12, 2008) (citing *U.S. Fidelity and Guar. Co. v. Klein Corp.*, 558 N.E.2d 1047, 1052 (Ill. App. Ct. 1989)), courts uphold these *prima facie* agreements where no competent counter-evidence is produced. *See Amwest Surety Ins. Co. v. Szabo*, No. 00 C 2716, 2003 WL 21789033, at *4-5 (N.D. Ill. July 23, 2003). Moreover, the court has considered the itemization and notes that each line item indicates the bond number, the payee, the cost category, the check date, the amount of the check, and the check number. Each affiant swore that these itemizations were generated from records created and maintained in the ordinary course of business, and that the expenses set forth in these itemizations relate to "losses, costs, fees and expenses incurred by Safeco by reason of or as a consequence of executing the Bonds and enforcing the Indemnity Agreement." In the absence of competent evidence to show that Safeco's itemizations are problematic, the court will enforce the *prima facie* liability clause as written.

**E. Interest**

Safeco requested prejudgment interest in its complaint. The decision to award prejudgment interest is within the sound discretion of the trial court, and is properly awarded where "authorized by statute, agreement of the parties or warranted by equitable considerations." *Tully v. McLean*, 948 N.E.2d 714, 741 (Ill. App. Ct. 2011); *see Am.*

*States Ins. Co. v. CFM Const. Co.*, 923 N.E.2d 299, 309 (Ill. App. Ct. 2010) ("A trial court's decision to award prejudgment interest is within its sound discretion."). Safeco has provided absolutely no argument regarding that issue in its statement of facts or summary judgment pleadings. Without any authority cited to show that Safeco has a statutory entitlement to such interest, or any factual basis to show that Safeco should be awarded such interest, the court denies Safeco's request. *See Am. States Ins. Co.*, 923 N.E.2d at 309 (finding that trial court did not abuse its discretion in denying a request for prejudgment interest where the parties requesting such interest "cited to no authority and provided no factual basis for their claim"); *see also Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) (warning that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived") (citation and quotation omitted).

In Illinois, however, an award of post-judgment interest is mandatory, as it is not a penalty or a bonus, but instead a "'preservation of the economic value of an award from diminution caused by delay.'" *See Eclipse Mfg. Co. v. U.S. Compliance Co.*, 886 N.E.2d 349, 360-61 (Ill. App. Ct. 2007) (quoting *Ill. State Toll Highway Authority v. Heritage Standard Bank & Trust Co.*, 626 N.E.2d 213, 223 (1993)); 735 Ill. Comp. Stat. Ann. 5/2-1303 ("Judgments recovered in any court shall draw interest at the rate of 9% per annum from the date of the judgment until satisfied."). Thus, post-judgment interest is awarded in accordance with 735 Ill. Comp. Stat. Ann. 5/2-1303.

## IV. CONCLUSION

For the reasons stated above, the court grants Safeco's motion for summary judgment. Defendants are jointly and severally liable to Safeco in the amount of $1,581,440.07 plus post-judgment interest.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: August 17, 2011